UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GLEN STETLER SHOWALTER,            :
                                   :CIVIL ACTION NO. 3:17-CV-0027
            Plaintiff,             :
                                   :(JUDGE CONABOY)
        v.                         :
                                   :
NANCY A. BERRYHILL,                :
Acting Commissioner of             :
Social Security,                   :
                                   :
            Defendant.             :
                                   :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI. (Doc. 1.) Plaintiff filed applications for benefits on September 11, 2013, alleging a disability onset date of May 26, 2010. (R. 18.) After he appealed the initial denial of the claims, a hearing was held on July 14, 2015, and Administrative Law Judge ("ALJ") Randy Riley issued his Decision on July 24, 2015, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 26.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on November 8, 2016. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on January 5, 2017. (Doc. 1.) He asserts in his supporting brief that the Acting Commissioner's

determination should be reversed or remanded for the following reasons: 1) the RFC assessment was inadequate because it failed to include all of Plaintiff's limitations of record; 2) the ALJ erred by giving Plaintiff's treating physician's opinions limited weight; and 3) the ALJ erred by relying on the absence of aggressive medical treatment to discount Plaintiff's credibility. (Doc. 13 at 3.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was born on September 11, 1966, and was forty-three years old on the alleged disability onset date. (R. 24.) He has a high school education and past relevant work as a maintenance technician. (R. 24.)

### A. *Medical Evidence*

In February 2010, Plaintiff was seen by Joseph E. Alhadeff, M.D., of Orthopaedic and Spine Specialists at the request of Mark Catterall, M.D., for right elbow pain, stiffness, and swelling. (R. 252-54.) Dr. Alhadeff diagnosed bursitis, gout, and possible tendonitis and injected Plaintiff's elbow at the first visit. (R. 254.) At his follow-up visit, Dr. Alhadeff recorded that the elbow was much better and he encouraged Plaintiff to do exercises to prevent recurrence. (R. 252.)

Plaintiff was seen at Manchester Family Medicine on July 30, 2010, for complaints of back pain and lumbar stiffness in the

morning for the preceding two months.  (R. 273.)  Notes indicate that x-ray and MRI were done at Dr. Catterall's office.  (*Id.*)  Notes were signed by Jeffrey Perry, D.O., who specializes in family practice.[1]

On August 6, 2010, Plaintiff was seen by K. Nicholas Pandelidis, M.D., of Orthopaedic and Spine Specialists at the request of Jeffrey Perry, D.O., because of low back problems.  (R. 250.)  By history, Dr. Pandelidis recorded that Plaintiff

> twisted his back at work about 8 weeks ago. He apparently was on some type of motor scooter and lost control of the scooter and twisted his back.  He has been having an aching pain in the mid to upper lumbar region.  The pain is worse with activities. The pain does improve with rest.  He had a course of therapy without much improvement. He is not using any medications currently. He has been working 4 hour[] shifts instead of the usual 12 hour shifts.

(*Id.*)  Physical examination findings were normal except back examination showed moderately decreased range of motion and mild upper lumbar tenderness.  (*Id.*)  X-rays showed moderate upper lumbar degenerative changes with no evidence of a destructive process or fracture.  (*Id.*)  Dr. Pandelidis diagnosed work-related back pain with irritation of pre-existing underlying degeneration.

---

[1]  Although the signature is not legible on any office notes from Manchester Family Practice, the identity of the signature with that of Dr. Perry on the Medical Source Statement of Ability to Do Work-Related Activities (Physical) (R. 286) and Pain Limitation Questionnaire (R. 287), indicates that he was the provider at all visits.

(*Id.*)  Dr. Pandelidis found "no evidence that he has sustained an injury that should leave him with any permanent impairment or dysfunction."  (*Id.*)  His treatment plan was symptom care and an exercise regimen.  (*Id.*)  "Work Status" indicated that Plaintiff would be kept on four-hour shifts for another week and then increase the shifts to six hours with further work status assessment to be done at Plaintiff's next visit.  (*Id.*)

At a Central PA Rehabilitation Services Assessment on August 13, 2010, Plaintiff indicated that he had had back pain since his May 26, 2010, work injury, he had some physical therapy which helped to some degree, and the pain never really went away.  (R. 262.)

At his August 25, 2010, follow-up visit, Dr. Pandelidis noted that Plaintiff reported that his employer would not allow him to return to work.  (R. 248.)  Physical examination showed that Plaintiff appeared more comfortable and had better mobility, he had an element of tenderness but no spasm, he had no lower extremity weakness, hip rotation and leg raise were well tolerated, his stance was upright, and his gait was good.  (*Id.*)  Dr. Pandelidis noted that Plaintiff could return to work unrestricted the following week.  (*Id.*)

August 31, 2010, physical therapy notes indicate that Plaintiff had progressed with decreased pain levels and slight improvement with function.  (R. 265.)  Notes also show that

4

Plaintiff was advised about the importance of exercises. (*Id.*)

On September 16, 2010, Plaintiff saw Steven Triantafyliou, M.D., of Orthopaedic and Spine Specialists with complaints of midback pain. (R. 246.) Plaintiff reported that his symptoms were aggravated with activities, bending, twisting, prolonged standing, walking, car riding, coughing, and sneezing. (*Id.*) He also reported that rest helped his symptoms. (*Id.*) Plaintiff rated his pain on an average day at three out of ten with the best day being one and the worst ten. (*Id.*) Physical examination showed stooped posture, slow and guarded gait, some difficulty with toe and heel walking secondary to pain, tenderness of the paraspinal area of the lower thoracic and upper lumbar region, some paraspinal muscle spasm, and range of motion of the lumbar spine limited to about fifty percent of normal including limitation in flexion, bending, and rotation. (R. 246.) Dr. Triantafyliou noted that musculoskeletal exam showed good range of motion of all joints in upper and lower extremity, and no atrophy or instability and neurological exam showed that motor testing was 5/5 in all muscle groups. (R. 247.) Dr. Triantafyliou reviewed diagnostic studies: MRI scan of June 18, 2010, showed no HNP or stenosis in the lumbar spine and no other problems were noted; limited view of the thoracic spine showed some dehydration changes to T10-11 and T11-12, mild at T12-L1 with associated Schmorl's node; x-rays of the lumbar spine done on August 10, 2010, showed disc heights to be

well-maintained. (*Id.*) He diagnosed midback pain, thoracic strain, and thoracic disc disease and recommended follow up after MRI of the thoracic region. (*Id.*)

On September 20, 2010, Plaintiff had MRI of the thoracic spine which showed "[m]ultilevel intervertebral disc degeneration without evidence of significant focal canal or foraminal encroachment. No suspicious intrinsic cord lesion identified. Incidental hemangioma in T3." (R. 255.)

At his visit with Dr. Triantafyliou on October 5, 2010, Plaintiff continued to complain of similar back symptoms. (R. 245.) Physical examination showed generalized tenderness of the lumbar spine and thoracic spine with sensation, reflexes and motor strength normal, and provocative tests negative. (*Id.*) Dr. Triantafyliou commented that the September 20th MRI showed degenerative changes but no herniations, fractures, or destructive lesions. (*Id.*) Dr. Triantafyliou explained to Plaintiff that a mild sprain type of injury like his as well as aggravation of pre-existing thoracic disc disease did not present any need for surgical intervention. (*Id.*) He recommended FCE (functional capacity evaluation) to assess Plaintiff's abilities and planned to see Plaintiff afterwards. (*Id.*)

Plaintiff was evaluated by Jessica Haag, DPT (doctor of phsyical therapy), on October 22, 2010. (R. 258-61.) She reported that

> [f]unctional testing revealed that Mr.
> Showalter is presently lifting in the medium
> category of work as demonstrated by his
> occasional floor to knuckle lift of 70
> pounds, knuckle to shoulder lift 60 pounds,
> floor to shoulder lift 60 pounds, 40-foot
> lift and carry of 40 pounds. . . . testing
> was ended due to client requesting stop
> testing secondary to pain and fatigue.

(R. 259.)  Dr. Haag found that Plaintiff could perform the

following activities occasionally (up to 33% of the day): standing,

walking, repetitive binding, stooping, squatting, crouching,

kneeling, crawling, climbing, overhead reaching, and repetitive

leg/arm movement.  (R. 258.)  She also found that he could

frequently (34-66% of the day) sit and forward reach.  (*Id.*)

Musculokeletal Evaluation revealed the following:

> Posture: Client sits with a forward flexed
> posture.  He has notable increased thoracic
> spine kyphosis.
> Gait: Client ambulates with a wide base of
> support and a forward flexed posture.
> Range of Motion: Lumbar spine flexion 46
> degrees, extension 10 degrees, right lateral
> flexion 14 degrees, left later flexion 19
> degrees, thoracic spine flexion 27 degrees,
> extension 2 degrees.
> Strength: Bilateral lower extremity strength
> 5/5. Core muscle strength rated fair.
> Neurological: Client is intact to light touch
> throughout bilateral lower extremities.
> Flexibility: Client has moderate flexibility
> limitations in bilateral lower extremities.
> Soft Tissue Assessment: Client has no areas
> of tenderness to palpation of the lumbar or
> thoracic spine and no muscle spasms.
> Special Tests: Client has a negative straight
> leg raise and slump test bilaterally.

(R. 260.)

At a Manchester Family Medicine checkup on November 2, 2011, it was noted that Plaintiff needed refills on medications. (R. 272.) Musculoskeletal examination findings indicate no paravertebral spasm and no tenderness. (*Id.*) Assessment was hypertension.

Plaintiff again saw Dr. Triantafyliou for follow-up and FCE review on Novmeber 2, 2010. (R. 243.) Physical examination showed that Plaintiff had some generalized tenderness in the lumbar spine and some muscle spasm with no other problems noted. (*Id.*) Regarding his FCE, Dr. Triantafyliou reported that "[b]asically he fails in the medium work category." (*Id.*) He gave Plaintiff routine back instructions, discussed activities, and noted that he planned to see Plaintiff in three months. (*Id.*)

On December 21, 2010, Plaintiff was seen at Manchester Family Medicine reporting ear drainage for a week and a half. (R. 271.) No musculoskeletal or neurological physical findings were recorded. (*Id.*)

At his February 15, 2011, visit with Dr. Triantafyliou, Plaintiff continued to complain of back pain, reporting that he had good days and bad days and his symptoms were aggravated with activity. (R. 242.) Dr. Triantafyliou again reported generalized tenderness in the lumbar spine and some muscle spasm and intact neurological exam. (*Id.*) The recorded "Plan" included that Plaintiff should "[c]ontinue on medium work restrictions" with

follow-up in three to four months. (*Id.*)

On February 16, 2011, Plaintiff visited Manchester Family Medicine with complaints of headaches over the preceding two months, including four days the preceding week. (R. 270.) Plaintiff noted they seemed to be associated with his back problem. (*Id.*) No neurological or physical examination findings were recorded. (*Id.*) Assessment was headache, sinusitis, TM rupture, and hypertension. (*Id.*)

At a routine follow-up for hyptension on March 1, 2011, Plaintiff continued to complain of headaches. (R. 268.) No neurological or physical examination findings were recorded. (*Id.*) Assessment was hypertension, hyperlipidemia, and migraine. (*Id.*)

Plaintiff was seen by Brian Koons, PA-C, at Orthopaedic & Spine Specialists on June 17, 2011. (R. 2440-41.) Plaintiff was seen by Mr. Koons because Dr. Triantafyliou was on vacation and Plaintiff wanted a note to be off work until his follow-up appointment with Dr. Triantafyliou. (R. 240.) Plaintiff explained that he had returned to work on light duty the previous day afer being off for a year. (*Id.*) He said that part of his job was cleaning cabinets close to the floor and, when he got home, he had severe pain in the lumbar spine region. (*Id.*) Plaintiff added that his work wanted Dr. Triantafyliou to reevaluate him. (*Id.*) He reported constant pain radiating down into his tailbone, he denied numbness or tingling sensations but noted nocturnal

disturbances. (*Id.*) Physical exam showed generalized tenderness in the midline and paraspinal areas of the thoracic and lumbar spine region, with lower extremity strength and sensation intact and negative straight leg raise tests. (*Id.*) Mr. Koons noted that he would keep Plaintiff out of work that night and allow him to return after that with sedentary work restrictions. (R. 421.) He also noted that Plaintiff would see Dr. Triantafyliou the following week. (*Id.*)

Plaintiff saw Dr. Triantafyliou on June 21, 2011. (R. 239.) Dr. Triantafyliou's physical findings were similar to earlier visits. (*Id.*) He reported that he gave Plaintiff reassurance and restrictions would be based on the FCE. (R. 239.)

On August 9, 2011, Dr. Triantafyliou recorded that Plaintiff had run out of medications and he renewed prescriptions for Tramadol and Mobic. (R. 238.) Physical examination was similar with decreased range of motion (50-75% of normal) also noted. (*Id.*) Dr. Triantafyliou stated that restrictions remained the same. (*Id.*)

At Plaintiff's September 13, 2011, office visit, Dr. Triantafyliou noted that Plaintiff had had a "a little bit of a setback and it is starting to settle down." (R. 237.) He commented that Tramadol was causing Plaintiff headaches and Mobic did not seem to be helping much so he changed Plaintiff's medication s to Soma and Relafen. (*Id.*) Dr. Triantafyliou again

noted that work restrictions would remain the same and he would see Plaintiff again in three to four months. (*Id.*)

A Workers' Compensation Status Report dated September 13, 2011, signed by Dr. Triantafyliou noted that Plaintiff could return to work with restrictions: he could occasionally lift less than seventy pounds floor to waist and less than sixty pounds waist to shoulder; he could occasionally carry less than forty pounds; he could frequently reach forward and overhead; he could occasionally sit up to eight hours a day, stand up to eight hours a day, and walk up to eight hours a day; he could occasionally stoop/bend, kneel, crouch/squat, crawl, climb ladders/stairs, and rotate/twist. (R. 256.) Dr. Triantafyliou noted that the restrictions were temporary. (*Id.*)

Orthopaedic & Spine Specialists sent Plaintiff a letter on January 11, 2012, reminding him it was time to be seen for follow-up and asking him to schedule an appointment. (R. 257.)

June 14, 2012, office notes from Manchester Family Medicine indicate that Plaintiff came in to discuss disability related to his back injury which had occurred two years earlier. (R. 267.) No neurological or musculoskeletal examination findings were recorded. (*Id.*) "Thoracic Disk DG" was included in the Assessment. (*Id.*)

Plaintiff was seen for orthopaedic consultation by Peter J. VanGiesen, M.D., of OSS Health on November 18, 2013. (R. 274.)

The evaluation was at the request of the Bureaus of Disability Determination. (*Id.*) Plaintiff described his pain

> in the thoracic and lumbar spine as an 8,
> which is involving sharp, dull, stabbing,
> throbbing, aching, burning pain which comes
> and goes, associated with tingling in the
> back. It seems to be unchanged. Symptoms
> made worse by standing, walking, lifting,
> exercise, twisting, bending, lying in bed,
> squatting, kneeling, stairs, and sitting, and
> made better by no measures. He wishes to use
> topical creams such as Voltaren gel and
> Pennsaid to his back for relief.

(*Id.*) Objective neurological examination showed sensation grossly intact to light touch and 1+ deep tendon reflexes bilaterally. (*Id.*) Musculoskeletal examination showed forward flexion 0 to 80 degrees, lateral flexion 0 to 10 degrees, deep tendon reflexes at the patella and Achilles 1+ bilaterally, negative sitting root test with antalgic to labored gait, and pain primarily at the thoracic and lumbar junction. (*Id.*) Dr. VanGiesen assessed the following: Degenerative Disc, L/LS Spine; Pain Low Back; Degenerative Disc, T/TL Spine; and Thoracic Back Pain. (*Id.*) The Care Plan indicated patient education and smoking cessation information. (*Id.*)

On April 26, 2015, Dr. Perry completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) and Pain Limitation Questionnaire. (R. 281-86, 287.) He opined that Plaintiff could lift and carry up to ten pounds occasionally and never lift over that. (R. 281.) Dr. Perry did not identify any medical or clinical findings to support his assessments or

otherwise explain the identified limitations. (*Id.*) He opined that Plaintiff could sit for one hour without interruption, and could stand/walk for five to thirty minutes without interruption. (R. 282.) He further opined that Plaintiff could sit for a total of three hours in an eight-hour day and could stand/walk for a total of one hour in an eight-hour day. (*Id.*) Dr. Perry noted that Plaintiff would be lying down for the remainder of the eight hours. (*Id.*) Regarding standing/walking/sitting, Dr. Perry indicated his findings were supported by chronic low back pain, degenerative disc, uncontrolled blood pressure of 199/99 on April 24, 2015, and uncontrolled hyperglycemia on February 28, 2014.[2] Dr. Perry found that Plaintiff could never push/pull, he could occasionally reach, handle, and finger, and he could frequently feel. (R. 283.) He explained these limitations with the notation that "with his back pain, he is limited in what he can do without exacerbating his pain." (*Id.*) Regarding the use of his feet, Dr. Perry concluded that Plaintiff could never operate foot controls because repetitious foot functions cause back pain. (*Id.*) He found that Plaintiff could occasionally climb stairs and ramps but he could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl because these activities could cause flare ups of his back symptoms. (R. 284.) Environmental limitations included

---

[2] The record does not contain office visit notes from any visits in February 2014 or April 2015.

no exposure to unprotected heights, extreme heat or cold and vibrations, and occasional exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, and dust, odors, fumes and other pulmonary irritants. (R. 285.) Dr. Perry noted that Plaintiff was able to shop, use standard public transportation, climb a few steps at a reasonable pace using a hand rail, prepare simple meals, care for his personal hygiene and sort, handle and use paper files but he could not walk a block at a reasonable pace on rough or uneven surfaces. (R. 286.) Dr. Perry indicated that limitations assessed had lasted or would last for twelve consecutive months. (*Id.*)

In the Pain Limitation Questionnaire, Dr. Perry indicted that pain prevented Plaintiff from performing his past work, it interfered with his concentration, persistence, or pace, he experienced good days and bad days due to pain, it would likely cause him to miss work at least two full days per month, it would cause significant interference with his social relationships at work, and it was likely to continue for at least twelve months. (R. 287.) He added that pain would negatively impact productivity by greater than 20-25% on a bad day. Dr. Perry also indicated that an objective source had been identified which medically and reasonably explained the pain, i.e., x-rays and orthopedic exam. (*Id.*)

At his office visit with Dr. Perry on July 24, 2015,

musculoskeletal examination showed the following: Plaintiff had no muscle aches, weakness, or cramps; he had no arthralgias, joint pain or swelling of the extremities; he had no difficulty walking; and he had back pain.[3]  (R. 290.)  Medication review does not indicate any pain medication.  (R. 289, 291.)  Dr. Perry assessed hypertension, hyperlipidemia, and diabetes mellitus.  (R. 292-93.)

## B.  *Hearing Testimony*

Plaintiff, who was represented by an attorney, and Vocational Expert Brian Bierley testified at the hearing on July 14, 2015. (R. 30-56.)  Plaintiff stated that he graduated from high school and had vocational training in commercial and residential wiring. (R. 34.)  When asked how he supported himself, Plaintiff said that his wife worked and he got $400 a month from his nephew who lived with him.  (*Id.*)  Plaintiff reported that he needed some help with showering lower extremities, he did not cook, he did limited grocery shopping, he did not do housework, he was able to drive, he did not climb stairs or ladders, he could walk about three hundred feet, he could stand for fifteen minutes before he had to sit, he could sit for about the same period of time before he had to get up, and  he took several naps a day.  (R. 35-38.)  Plaintiff said took several medications but not for his back.  (R. 38.)  Upon questioning by his attorney, Plaintiff clarified that he only

---

[3]  This office visit took place the same day ALJ Riley issued his Decision and records from the visit were not considered by the ALJ.  (*See* R. 26, 29.)

drives limited distances, like the twenty to twenty-five minutes to the hearing and hitting potholes in the roads aggravated his back. (R. 40.)

Plaintiff testified that he treated with Dr. Perry roughly every three months. (R. 48-49.) He said he stopped seeing Dr. Triantafyliou because "he didn't see anything in the film and stuff to indicate any problems." (R. 49.) Plaintiff said there was definitely something wrong and he and his wife decided they needed an answer. (*Id.*) Plaintiff testified that Dr. Triantafyliou did not offer him any treatment that he did not want to do. (R. 49-50.)

ALJ Riley asked Vocational Expert Brian Bierley ("VE") to consider an individual of Plaintiff's age, education, and work experience who could do "[l]ight work, stand walk limitation of two hours, should be allowed to be able to sit, alternate positions between sitting and standing every 20 minutes, occasional stairs, balance stoop, kneel, crouch, crawl, never any ladders, and avoid exposure to hazards." (R. 51.) The VE testified that such an individual could not do Plaintiff's past job but other types of employment would be available such as small products assembler and electrical accessories assembler. (*Id.*) The VE stated that examples of sedentary work available included final assembler. (*Id.*) When the ALJ added the limitations that the individual would not be able to engage in sustained work activity on a regular

16

continuing basis for eight hours a day, five days a week, for a forty hour week, the VE stated that no jobs would be available. (R. 52.)

Upon questioning by Plaintiff's attorney, the VE stated the following: an individual who was unable to maintain an 85% level of productivity at minimum would not be able to maintain employment; if the ALJ were to find that the individual could sit for a total of three hours, stand for one hour, and walk for one hour in an eight-hour day, none of the identified jobs would be available; if the individual routinely needed to lie down during an eight-hour workday, all occupations would be excluded; and if the ALJ were to find that the individual were capable of only occasional reaching, fingering, and handling, the identified jobs would be excluded. (R. 53-54.)

## C.   *ALJ Decision*

In his July 24, 2015, Decision, ALJ Riley found that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, degenerative disc disease of the thoracic spine, and obesity.  (R. 20.)  He determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.  (R. 21.)  ALJ Riley made the following RFC assessment:

> [T]he claimant has the residual functional
> capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except he
> can stand and walk up to 2 hours; must be

> able to alternate between sitting and
> standing every 20 minutes; limited to
> occasional stair climbing, balancing,
> stooping, kneeling, crouching and crawling;
> can never climb ladders; and must avoid
> exposure to hazards.

(R. 21.) ALJ Riley then determined that Plaintiff was unable to perform his past relevant work but jobs exist in significant numbers in the national economy that Plaintiff could perform. (R. 24.) He therefore found that Plaintiff had not been under a disability from May 26, 2010, through the date of the decision. (R. 25.) Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4] It is necessary for the

---

[4] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

18

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

---

42 U.S.C. § 423(d)(2)(A).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 24-25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in

> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final

decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the RFC assessment was inadequate because it failed to include all of Plaintiff's limitations of record; 2) the ALJ erred by giving Plaintiff's treating physician's opinions limited weight; and 3) the ALJ erred by relying on the absence of aggressive medical treatment to discount Plaintiff's credibility. (Doc. 13 at 3.)

Because Plaintiff relies on the treating physician's opinion in support of his RFC argument (Doc. 13 at 4-6), the Court will first consider Plaintiff's second claimed error regarding the weight afforded the treating physician's opinions (*id.* at 6-9).

## A. *Treating Physician Opinions*

Plaintiff contends the ALJ erred by giving the opinions of Plaintiff's treating physician, Dr. Perry, little weight. Doc. 13 at 6.) Defendant responds that substantial evidence supports the ALJs assessments of medical source opinions. (Doc. 15 at 11.) The Court concludes Plaintiff has not shown this claimed error is cause for reversal or remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[5] *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely

---

[5] A new regulation regarding weight attributed to a treating source affects claims filed after March 27, 2017. For claims filed after March 27, 2017, 20 C.F.R. § 404.1520c eliminates the treating source rule. In doing so, the Agency recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). This case, based on claims filed on Sept. 11, 2013 (R. 18), is not affected by the new regulation and is to be analyzed under the regulatory scheme cited in the text.

accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[6] "A cardinal principle

---

[6] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

This Court has approved the proposition that "'generally, the ALJ will lack substantial evidence to assign less than controlling weight to a treating source opinion with only a lay interpretation of medical evidence or an opinion from a non-treating, non-examining source who did not review a complete record.'" *Blum v. Berryhill*, Civ. A. No. 3:16-CV-2281, 2017 WL 2463170, at *8 (M.D. Pa. June 7, 2017) (quoting *Carver v. Colvin*, Civ. A. No. 1:15-CV-00634, 2016 WL 6601665, at *18 (M.D. Pa. Sept. 14, 2016) (citations omitted)). The Court's approval was based on the assessment that

the *Carver* framework is both practical and consistent with Third

Circuit caselaw. *Blum*, 2017 WL 2463170, at *8.

Here, ALJ Riley explained his assessment of Dr. Perry's

opinion as follows:

> Little weight is afforded to the opinion
> of Jeff Perry, D.O., suggesting that the
> claimant can perform less than the full range
> of sedentary work, as he provided no
> treatment records in support of his opinions,
> and they are inconsistent with the
> conservative level of treatment received and
> the claimant's clinical presentation (i.e.
> preserved reflexes, mildly diminished range
> of motion and intact sensation) (Exhibit 4).
> Furthermore, there is no evidence of weakness
> in the lower extremities or need for an
> assistive device to warrant significant
> walking limitations or sedentary work.

(R. 23.)  The review of evidence preceding this specific assessment

includes the evidence which ALJ Riley finds outweighs Plaintiff's

alleged disabling limitations:

> The record does not evidence severe pathology
> via diagnostic imaging.  An MRI of the lumbar
> spine in June 2010 showed no HNP or stenosis,
> and diagnostic imaging fo the thoracic spind
> showed some dehydration changes at T10-11,
> and T11-12, mild at T12-L1 with associated
> Schmorl's node but no fractures (Exhibit
> 1F/11).  There is no evidence of nerve root
> compression, bladder or bowel involvement,
> intractable pain, significant instability, or
> neurological compromise related to the
> claimant's back pain (Exhibits 1F, 2F, 3F).
> Despite the claimant's allegations of
> debilitating pain, there is no evidence of
> significant clinical abnormalities such as
> markedly diminished range of motion, muscle
> atrophy or motor deficits (Exhibits 1F 2F,
> 3F).  To the contrary, on examination the
> claimant typically shows only mildly reduced

26

range of spinal motion, no edema, negative
straight leg raises, preserved reflexes and
intact sensation (Exhibits 1F, 2F/1, 3F).
Treatment records from his primary care
physician reveal that the claimant did not
show paravertebral spasm or tenderness of the
spine despite his impairments (Exhibit 2F).
Moreover, these records document that he
showed full range of motion without
restriction (Exhibit 2F). The claimant has
shown an antalgic gait, but he does not
require an assistive dvice for ambulation
(Exhibit 3F/1).

The medical evidence reveals that the
claimant requires very little treatment
despite his complaints of disabling pain.
Records show that the claimant only requires
conservative treatment for his pain, such as
use of Tramadol, Mobic and over-the-counter
modalities (Exhibit 1F). . . . . Notably, there
is no evidence of treatment since 2012 which
is inconsistent with the claimant's
allegations that he suffers ongoing
debilitating symptomatology.

(R. 22-23.)

The ALJ's evidence review and opinion assessment clearly show

he cited appropriate reasons to assign less than controlling or

significant weight to Dr. Perry's opinions in that he found they

were not supported by treatment records, were not consistent with

clinical presentation, and were contradicted by other evidence of

record. *See* 20 C.F.R. § 404.1527(c)(2). The principle that great

weight is due an opinion that "reflects expert judgment based on

continuing observation of the patient's condition over a prolonged

period of time," *Morales*, 225 F.3d at 317, is greatly diminished

where "there is no evidence of treatment since 2012."[7]  (R. 23.)
Importantly, Plaintiff does not refute the evidence relied upon by
the ALJ and does not argue that such evidence does not contradict
Dr. Perry's opinions.  (*See* Doc. 13 at 6-8.)  Plaintiff's
conclusory statement that "[t]he ALJ did not provide good reasons,
or identify appropriate circumstances to assign less than

---

[7]  The definition of "treating source" is instructive:

> Treating source means your own acceptable
> medical source who provides you, or has
> provided you, with medical treatment or
> evaluation or who has, or has had, an ongoing
> treatment relationship with you.  Generally,
> we will consider that you have an ongoing
> treatment relationship with an acceptable
> medical source when the medical evidence
> establishes that you see, or have seen, the
> source *with a frequency* consistent with
> accepted medical practice for the type of
> treatment and/or evaluation required for your
> medical condition(s).  We may consider an
> acceptable medical source who has treated or
> evaluated you only a few times or only after
> long intervals (e.g., twice a year) to be
> your treating source if the nature and
> frequency of the treatment or evaluation is
> typical for your condition(s).  *We will not
> consider an acceptable medical source to be
> your treating source if your relationship
> with the source is not based on your medical
> need for treatment or evaluation, but solely
> on your need to obtain a report in support of
> your claim for disability.  In such a case,
> we will consider the acceptable medical
> source to be a nontreating source.*

20 C.F.R. § 404.1527(a)(2) (emphasis added).  This definition
indicates it was not improper for the ALJ to consider significant
the lack of treatment for almost three years preceding Dr. Perry's
opinions.

controlling weight to the opinions of treating physician, Dr. Perry" (Doc. 13 at 8) does not satisfy his burden of showing error on the basis alleged, and, for the reasons discussed above, is an inaccurate conclusion when considered in the context of the relevant portion of ALJ Riley's decision.[8]  In sum, Plaintiff has not demonstrated that *the evidence shows* that Dr. Perry's opinions regarding Plaintiff's back problems are entitled to greater deference than that assigned by ALJ Riley.

Plaintiff's assertion of error regarding the assessment of Dr.

---

[8] Though not specifically cited by the ALJ, the conclusion that the ALJ did not err in his assessment of Dr. Perry's opinions is bolstered by several considerations: 1) a review of office visit notes indicates that Plaintiff visited the practice six times from the time of his workplace accident in May 2010 through June 12, 2012 (R. 267-273) and Dr. Perry's opinion was rendered more than thirty-four months later on April 26, 2015; 2) at only two of those six visits were any musculoskeletal examination findings recorded--on July 30, 2010, Dr. Perry noted forward range of motion was without restriction (R. 273) and on November 2, 2010, he noted no paravertebral spasm and no tenderness (R. 272); 3) records do not show that Dr. Perry ever performed a  neurological examination at any office visit or otherwise; 4) back problems were not included in Dr. Perry's assessments until June 14, 2012, a visit at which there is no indication of musculoskeletal or neurological examination (R. 267); at the only office visit of record following the April 2015 opinion (July 24, 2015, appointment) Dr. Perry recorded musculoskeletal examination findings that Plaintiff had no muscle aches, weakness, or cramps, he had no arthralgias, joint pain or swelling of the extremities, he had no difficulty walking, and he had back pain (R. 290); 5) in the Pain Limitation Questionnaire, Dr. Perry identified the objective source which could "medically and reasonably explain the individual's pain to be "xrays/orthopedic exam" (R. 287) yet records do not show that Dr. Perry had seen Plaintiff in over two years, Dr. Perry's limited exams revealed no problems (R. 272-73), and Plaintiff's last orthopedic evaluation was conducted by Dr. VanGiesen over a year before the opinion (R. 274).

Brown's opinion is similarly deficient in that his conclusory statements primarily focus on the weight which the ALJ *should have* afforded Dr. Perry's opinions (Doc. 13 at 7-9) and the Court has concluded that premise is unsupported. Further, the only records Plaintiff points to that Dr. Brown did not review are Dr. Perry's April 26, 2015, opinions (Doc. 13 at 8) and the limited weight properly attributed to Dr. Perry's opinions puts this case in the rare category where all relevant non-opinion medical evidence was reviewed by Dr. Brown. Importantly, no evidence of record shows that Plaintiff had a single office visit, diagnostic test, or other in-person medical encounter from the date Dr. Brown rendered his opinion on December 19, 2013, to the date Dr. Perry completed the form opinions over a year later on April 26, 2015. (*See* R. 237-87.)

The foregoing analysis shows the general rule discussed in *Blum* and *Carver* regarding the propriety of assigning greater weight to the opinion of a non-treating, non-examining source does not apply given the facts of this case. Having shown no error in the ALJ's assessment of the opinions at issue, Plaintiff has not shown that this claimed error is cause for reversal or remand.

**B. *RFC Assessment***

Plaintiff asserts the RFC was inadequate because it failed to include all of his limitations of record and the ALJ was not entitled to rely on the inaccurate hypothetical posed to the

Vocational Expert. (Doc. 13 at 3-6.) Defendant responds that substantial evidence supports the RFC assessment and Plaintiff has failed to demonstrate the existence of any credibly established limitations from his alleged impairments not already captured in the RFC. (Doc. 15 at 5, 8.) The Court concludes Plaintiff has not shown that the claimed error is cause for reversal or remand.

Whether considered a challenge to the RFC assessment or a challenge to the adequacy of the hypothetical posed to the VE, Plaintiff's argument is to be analyzed pursuant to guidance set out in *Rutherford* concerning what asserted limitations must be considered. 399 F.3d at 554 n.8. An ALJ is not required to submit to the vocational expert every impairment alleged by a claimant. 399 F.3d at 554. Rather, the hypothetical posed must "accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Id.* (citing *Plummer*, 186 F.3d at 431.) Whether a limitation is credibly established is thus the crux of the issue.

Plaintiff maintains ALJ Riley erred because he did not include limitations identified in Dr. Perry's opinions. (Doc. 13 at 4-6.) As discussed above, Plaintiff did not show that the ALJ erred in assigning little weight to those opinions. Therefore, Plaintiff cannot rely on the opinions to show that a limitation was credibly established. Aside from Dr. Perry's discredited findings, Plaintiff points to no basis to find any credibly established

limitation not captured in the RFC.  (*See id.* at 3-6.)  Without

such evidence, Plaintiff has not met his burden of showing that the

claimed error is cause for reversal or remand.

## C.    *Consideration of Medical Treatment*

Plaintiff finally claims that the ALJ erred by relying on the

absence of aggressive medical treatment to discount Plaintiff's

credibility.  (Doc. 13 at 9-12.)  Defendant responds that

substantial evidence supports the ALJ's evaluation Plaintiff's

subjective complaints.  (Doc. 15 at 15-21.)  The Court concludes

Plaintiff has not shows that this claimed error is cause for

reversal or remand.

The Third Circuit Court of Appeals has stated that we

"ordinarily defer to an ALJ's credibility determination because he

or she has the opportunity at a hearing to assess a witness's

demeanor."  *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

"Credibility determinations are the province of the ALJ and should

only be disturbed on review if not supported by substantial

evidence."  *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305,

at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717

F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance

regarding the evaluation of a claimant's statements about his or

her symptoms:

> In general, the extent to which an
> individual's statements about symptoms can be

> relied upon as probative evidence in
> determining whether the individual is
> disabled depends on the credibility of the
> statements.  In basic terms, the credibility
> of an individual's statements about pain or
> other symptoms and their functional effects
> is the degree to which the statements can be
> believed and accepted as true.  When
> evaluating the credibility of an individual's
> statements, the adjudicator must consider the
> entire case record and give specific reasons
> for the weight given to the individual's
> statements.

SSR 96-7p.  "One strong indication of the credibility of an

individual's statements is their consistency, both internally and

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under

which a claimant's subjective complaints are to be considered.  20

C.F.R. § 404.1529.  First, symptoms such as pain, shortness of

breath, and fatigue will only be considered to affect a claimant's

ability to perform work activities if such symptoms result from an

underlying physical or mental impairment that has been demonstrated

to exist by medical signs or laboratory findings.  20 C.F.R. §

404.1529(b).  Once a medically determinable impairment which

results in such symptoms is found to exist, the Commissioner must

evaluate the intensity and persistence of such symptoms to

determine their impact on the claimant's ability to work.  *Id.*  In

so doing, the medical evidence of record is considered along with

the claimant's statements.  *Id.*

The regulations set out factors relevant to consideration of

symptoms such as pain: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

The Third Circuit has explained:

> An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green* [*v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)]. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contradictory medical evidence. *Carter* [*v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Here the only "medical evidence" which Plaintiff cites as supportive of his complaints of pain is Dr. Perry's Pain Limitation

Questionnaire completed on April 26, 2015.[9]  (Doc. 13 at 10-11

(citing R. 287).)  As discussed above, Plaintiff did not show that

ALJ Riley erred in discounting this opinion.  Therefore,

Plaintiff's sole reliance on Dr. Perry's pain-related assessments

cannot meet his burden of showing error on the basis alleged.

Furthermore, the ALJ considered factors identified as relevant to

the inquiry of Plaintiff's credibility regarding pain including the

location, duration, frequency and intensity of the pain or other

symptoms as reported by Plaintiff and examining sources,

medications taken to alleviate symptoms, treatment received other

than medication intended to relieve pain or other symptoms, and

other measures used for pain/symptom relief (R. 22-23).  *See* 20

C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Finally, Plaintiff notes "the ALJ failed to acknowledge that

Plaintiff's obesity supports his claims regarding his symptoms."

(Doc. 13 at 11.)  Plaintiff does not point to anything in the

record to support a conclusion that the asserted lack of discussion

was harmful error.  (*Id.*)  Thus, Plaintiff has not met his burden

---

[9]  Plaintiff cites *Green v. Schweiker*, 749 F.2d 1066, 1070-71
(3d Cir. 1984), for the proposition that "[a]n absence of medical
evidence does not constitute contrary medical evidence."  (Doc. 13
at 10 (citing *Green*, 749 F.2d at 1070-71).)  While this is true,
here the ALJ reviewed specific findings which he determined limited
Plaintiff's credibility regarding his claim that he had totally
debilitating pain.  (R. 22-23.)  His review included reference to a
total lack of treatment for a period of over two years (R. 23)
which is a consideration not prohibited by *Green*, the regulatory
scheme reviewed in the text, or common sense.

of showing that the claimed error is cause for reversal or remand.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: August 24, 2017